NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 45

No. 2019-121

| | |
|---|---|
| Joaninha Kitoko | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Addison Unit, |
| | Family Division |
| | |
| Manzambi Salomao | June Term, 2019 |

David R. Fenster, J.

Michelle Donnelly and Erin Jacobsen, South Royalton Legal Clinic, South Royalton, for
  Plaintiff-Appellant and Minor Children.


PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.


¶ 1. **REIBER, C.J.** This case concerns the trial court's authority to make special findings necessary for individuals to apply for "special immigrant juvenile" (SIJ) status under federal law. The trial court concluded that it lacked authority to make SIJ findings because they were not necessary to its parental-rights-and-responsibilities (PRR) decision. We conclude that given the primacy of a child's best interests in cases like this and the court's broad discretion in determining those interests, the court does have the authority to make such findings. It should make such findings when it is in a child's best interests to do so and where such findings are supported by the evidence. We therefore reverse and remand the trial court's decision to allow it to engage in this analysis. Because one of the juveniles will turn eighteen on July 13, 2019, we issue the mandate immediately and direct the court to issue its findings forthwith.

¶ 2.     At the foundation of our analysis is Vermont's commitment to promoting children's best interests. Vermont "regards the protection of children as one of [our] most important responsibilities." Eddy v. Eddy, 2003 VT 67, ¶ 11, 175 Vt. 608, 833 A.2d 1243 (mem.); see also Varnum v. Varnum, 155 Vt. 376, 384, 586 A.2d 1107, 1111 (1990) (citing Fisher v. Fisher, 324 N.W.2d 582, 584 (Mich. Ct. App. 1982) (finding it "difficult" to conceive of a more compelling state interest)) (stating that "[t]here is no question that the societal interest in protecting and nurturing children is great"). We interpret our laws to serve a child's best interests and "our paramount concern" is "the effect of our laws on the reality of children's lives." In re B.L.V.B., 160 Vt. 368, 373-77, 628 A.2d 1271, 74-1276 (1993) (construing term "stepparent" to include unmarried same-sex partner of recognized parent for purposes of stepparent adoption because Legislature's overarching intent in passing adoption statute was to promote best interests of children).

¶ 3.     We begin with an overview of the SIJ law, emphasizing at the outset the purpose of this federal provision and its consonance with priorities in our own state law. As the Maryland Court of Appeals aptly observed:

> Children are a vulnerable cohort, uniquely susceptible to various forms of mistreatment. Their protection is of the utmost importance to all involved in governance and the administration of justice. Consequently, numerous policies at both the federal and state level have been implemented to protect the safety and well-being of children in this country.

Romero v. Perez, 205 A.3d 903, 904-05 (Md. 2019). SIJ status is designed to protect vulnerable children. It was added to the Immigration and Nationality Act in 1990 "to enable immigrant children who have been subject to abuse, neglect, or abandonment by one or both of their parents to remain in the United States and apply for lawful permanent residence." Guardianship of Penate, 76 N.E.3d 960, 965 (Mass. 2017) (citing 8 U.S.C. § 1101(a)(27)(J)); see also Recinos v. Escobar, 46 N.E.3d 60, 63 (Mass. 2016) (explaining that SIJ status "create[s] a pathway to citizenship for

2

immigrant children"). Obtaining SIJ status is a multistep process that requires the involvement of "both State courts and Federal agencies." Penate, 76 N.E.3d at 965.

¶ 4.    To apply for SIJ status, an immigrant child must first obtain special findings from a state "juvenile court." See 8 C.F.R. § 204.11 (defining "juvenile court" as "a court located in the United States having jurisdiction under State law to make judicial determinations about the custody and care of juveniles"). The required findings are derived from the following definition of a "special immigrant":

> (J) an immigrant who is present in the United States—
>
> (i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law; [and]
>
> (ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence . . . .

8 U.S.C. § 1101(a)(27)(J).

¶ 5.    After obtaining such findings, an immigrant child must then "file a petition, including the special findings, with USCIS [(United States Citizenship and Immigration Services)]," which "conducts a plenary review." Penate, 76 N.E.3d at 966 (citing 8 C.F.R. § 204.11). The petition must be filed before a child turns twenty-one, id., but a "child will not 'age-out' of SIJ status" if the petition remains pending after that date. Recinos, 46 N.E.3d at 65 (citing William Wilberforce Trafficking Victims Protection Reauthorization Act, Pub. L. 110-457, § 235(d)(6), 122 Stat. 5044). USCIS "makes the final determination whether to grant SIJ status," although it "generally defers to the juvenile court's determinations, and does not reweigh the evidence insofar as it relates to matters of state law." Penate, 76 N.E.3d at 966; see generally U.S.

Citizenship & Immigration Servs., Policy Manual, vol. 6, part J, Special Immigrant Juveniles, https://www.uscis.gov/policy-manual/volume-6-part-j; U.S. Citizenship & Immigration Servs., Green Card Based on Special Immigrant Juvenile Classification, https://www.uscis.gov/green-card/special-immigrant-juveniles/green-card-based-special-immigrant-juvenile-classification [https://perma.cc/X63X-MNCN]. "Once SIJ status is approved, the minor can apply for legal permanent residence." J.U. v. J.C.P.C., 176 A.3d 136, 139 (D.C. 2018).

¶ 6.    Thus, as set forth above, "a person's immigration status remains a matter governed solely by Federal law," but the responsible federal agency relies on state courts to "make the special findings of fact necessary to the USCIS's legal determination of the immigrant child's entitlement to SIJ status." Penate, 76 N.E.3d at 966. This "unique hybrid procedure" recognizes that state courts have " 'distinct expertise . . . in the area of child welfare and abuse,' which makes them best equipped to shoulder 'the responsibility to perform a best interest analysis and to make factual determinations about child welfare for purposes of SIJ eligibility.' " Id. (quoting Recinos, 46 N.E.3d at 65); see also J.U., 176 A.3d at 139 n.6 ("The unusual involvement of state courts in what is ultimately a federal immigration decision appears based on the belief that state courts have greater experience in determining matters of abuse, neglect, and abandonment.").[1]

¶ 7.    States have responded to the SIJ law in various ways. See generally K. Moulding, Eligibility for Special Immigrant Juvenile Status Under 8 U.S.C.A. § 1101(a)(27)(J) and 8 C.F.R. § 204.11, 67 A.L.R. Fed. 2d 299 (2012) (discussing case law). Some states, like Florida and California, have enacted laws "authorizing a lower court to conduct a proceeding for the sole purpose of making the SIJ findings of fact." De Rubio v. Rubio Herrera, 541 S.W.3d 564, 571 n.6 (Mo. Ct. App. 2017) (citing statutes). Numerous state courts have held "that their juvenile courts

---

[1] The USCIS Policy Manual recognizes that states must apply their own laws in evaluating a child's best interests. See U.S. Citizenship & Immigration Servs., Policy Manual, vol. 6, part J, Special Immigrant Juveniles, https://www.uscis.gov/policy-manual/volume-6-part-j.

have a duty to make the SIJ findings described in the federal statute, despite the lack of any state law explicitly permitting or requiring them to do so." Id. at 571, 571 n.7 (citing cases). The Penate court, for example, concluded that because state courts play a "fact-finding role [that] is integral to the SIJ process, [Massachusetts] Probate and Family Court judge[s] may not decline to make special findings if requested." 76 N.E.3d at 966; see also Recinos, 46 N.E.3d at 65 (concluding "that the Probate and Family Court has jurisdiction, under its broad equity power, over youth between the ages of eighteen and twenty-one for the specific purpose of making the special findings necessary to apply for SIJ status pursuant to the INA").

¶ 8.   The Virginia Court of Appeals held, by contrast, that its courts have no authority to entertain independent SIJ petitions. Canales v. Torres Orellana, 800 S.E.2d 208, 216-17 (Va. Ct. App. 2017). The court acknowledged that "there may be circumstances when a Virginia court, by rendering a custody determination in the normal course, will deliver a judgment and resulting order that may satisfy the SIJ requirements," but held that its courts were not "required to make such findings or tailor their orders to increase the likelihood that federal immigration officials will find them acceptable." Id. at 220; see also De Rubio, 541 S.W.3d at 572-73 (citing Canales and concluding that Missouri juvenile courts could, but were not required to, make special findings if requested in dissolution case).

¶ 9.   With this overview in mind, we turn to the facts here. Mother and her four minor children are undocumented immigrants from Angola living in Vermont. Mother is married to the children's father. At one time, father indicated that he would join the family in North America but he has not done so; he is believed to be in Angola. Mother alleged that father had not contacted or supported the family since 2013. She also testified that there is no place for the children in Angola.

¶ 10.   In February 2018, mother sought relief under 15 V.S.A. § 291. Section 291(b) provides that when a married person deserts or fails to support a spouse, the spouse may ask the

5

court to "make such orders as it deems expedient concerning the support of either spouse and the care, custody, education, and maintenance of the minor children of the parties," including "determin[ing] with which of the parents the children, or any of them, shall remain." The court may thereafter, upon request, "revise and alter such order" as needed. Id.[2] Mother sought an award of sole legal and physical PRR based on father's abandonment of the family. Mother also asked the court to make special findings that would allow the children to apply for SIJ status with the USCIS. Father was served by publication in Angola.

¶ 11. Following a hearing, the court made findings on the record with respect to PRR. It found that parents married in September 2000, father deserted mother, and the parties were living separate and apart. The parties' children ranged in age from eight to seventeen. The children had lived with mother at least since July 2013 when mother left Angola. Since that time, mother was clearly the children's primary caretaker. She had a significant relationship with the children and the ability and disposition to provide them with love, affection, and guidance. The court made additional findings related to the statutory best-interests factors set forth in 15 V.S.A. § 665. It concluded that it was in the children's best interests that mother have sole PRR, both legal and physical. It did not order any parent-child contact with father.

¶ 12. After additional briefing, the court denied mother's request for SIJ findings. The court described the legal framework set forth above and considered case law from other states. It found Canales most persuasive and thus concluded that it must apply Vermont law "in the same manner" as "in every other custody case that does not involve a juvenile immigrant." 800 S.E.2d at 220-21. Applying this standard, the court determined that, in evaluating mother's PRR request and the children's best interests, it lacked authority to decide whether reunification with father was

---

[2] Contrary to the trial court's statement, § 291 was not repealed by the new parentage statute. See 2017, No. 162, § 2 (repealing "15 V.S.A. chapter 5, subchapter 3A (parentage proceedings)" but not subchapter 3, which governs "support of spouse and care of children").

"not viable due to abuse, neglect, abandonment, or a similar basis found under State law" or whether it would not be in the children's best interests to be returned to Angola. 8 U.S.C. § 1101(a)(27)(J). The court believed it would be offering an advisory opinion by addressing these issues.

¶ 13. As to the reunification-viability question, the court expressed uncertainty whether father had permanently deserted the children and observed that it would not ordinarily make findings about the likelihood of future reunification in the context of a PRR determination. The court further reasoned that because no parent was seeking to return the children to Angola, it need not make a finding whether it would be in the children's best interests to do so. The court stated that it had no context in which to weigh whether returning to Angola would be in the children's best interests and it questioned, in any event, how it could square such a finding with the deference owed to the custodial parent's residency decisions. The court thus denied mother's request for special findings. Mother appealed.

¶ 14. Mother argues that the court does have authority to issue the SIJ findings and she urges us to join the numerous state courts so holding. Mother maintains that the findings she requested fall squarely within an evaluation of the children's best interests, which is the touchstone in divorce, parentage, and similar cases. She argues that the court wrongly suggested that it must find that father permanently abandoned the children to determine that reunification with him was not viable. Mother further asserts that because the government seeks to return the children to Angola, there is nothing abstract about evaluating whether it would be in their best interests to return there. Mother emphasizes that the purpose of the SIJ law is to protect children from this very outcome if doing so would mean returning them to an abusive, neglectful, or absent parent or to a situation otherwise against their best interests. She argues that the evidence she presented shows that reunification with father is not viable and that returning the children to Angola is not in their best interests.

7

¶ 15. We consider de novo whether the court has authority to issue SIJ findings. Breslin v. Synnott, 2012 VT 57, ¶ 8, 192 Vt. 79, 54 A.3d 525 (explaining that Supreme Court reviews questions of law de novo).

¶ 16. We emphasize at the outset that the trial court in this case had jurisdiction. This is not a freestanding action for SIJ findings but rather a petition for relief under § 291. The court plainly had subject matter jurisdiction over this case. See 4 V.S.A. § 33(a)(1) (stating that family division has "exclusive jurisdiction to hear and dispose of . . . [a]ll desertion and support proceedings . . . filed pursuant to 15 V.S.A. chapter 5"); Lamell Lumber Corp. v. Newstress Int'l, 2007 VT 83, ¶ 6, 182 Vt. 282, 938 A.2d 1215 (" 'Subject matter jurisdiction' refers to the power of a court to hear and determine a general class or category of cases."). Mother did not ask the court to issue any orders concerning the children's immigration status but, rather, requested only that, in the context of this desertion and support case, the court make certain findings. The court does not need independent jurisdictional footing to honor mother's requests for particular findings in this case over which the court has jurisdiction by statute.[3]

¶ 17. In considering mother's petition, the court has authority to make SIJ findings if doing so serves a child's best interests. We leave the substance of such findings to the trial court based on its evaluation of the evidence.

¶ 18. As set forth above, in enacting the SIJ law, Congress created "a unique hybrid procedure that directs the collaboration of state and federal systems." H.S.P. v. J.K., 121 A.3d 849, 857-58 (N.J. 2015) (quotation omitted) (relying on structure of federal law to conclude that courts must make SIJ findings). State courts are asked "to make initial SIJ factual

---

[3] For that reason, we need not decide whether the family division of the superior court would have jurisdiction to entertain a freestanding request for SIJ findings, unconnected to any dispute over which the court has statutory jurisdiction.

findings . . . because of the expertise that these courts have in issues relating to the care and custody of juveniles." Simbaina v. Bunay, 109 A.3d 191, 201 (Md. Ct. Spec. App. 2015).

¶ 19.    We do not go so far as other states that always require their courts to make such findings when requested.  See, e.g., In re J.J.X.C., 734 S.E.2d 120, 124 (Ga. Ct. App. 2012) (concluding that SIJ statute "affirms the institutional competence of state courts as the appropriate forum for child welfare determinations regarding abuse, neglect, or abandonment, and a child's best interests" and court "has a duty to consider the SIJ factors and make findings"); Romero, 205 A.3d at 908 ("The [Maryland] Court of Special Appeals has held, and we agree, that when a party requests SIJ status findings in his or her pleadings, the circuit court must undertake the fact-finding process (hear testimony and receive evidence) and issue 'independent factual findings regarding' the minor's eligibility for SIJ status." (quoting Simbaina, 109 A.3d at 194)); Simbaina, 109 A.3d at 194, 197 (concluding that SIJ statute imposes duty on state court to make special SIJ findings, which are advisory to federal agency determination; finding no separation-of-powers issue; and stating that "federal government delegated the powers to make initial SIJ factual findings to state juvenile courts because of the expertise that these courts have in issues relating to the care and custody of juveniles"); In re L.F.O.C., 901 N.W.2d 906, 911 (Mich. Ct. App. 2017) (finding it "clear that a state juvenile court has authority to issue factual findings pertinent to a juvenile's SIJ status," and "trial court erred to the extent that it found that it lacked authority to make predicate factual findings pertaining to the issue of SIJ status").  But our holding that Vermont courts have the authority to make such findings leads to a corollary principle that courts generally should make such findings when doing so is in the best interests of the children concerned.  This holding does not flow from any purported federal command but, rather, rests on a traditional exercise of the trial court's statutory and discretionary authority guided, as it must be, by what course of action is in a child's best interests.

¶ 20. As noted above, the court had jurisdiction over the children in connection with mother's § 291 petition. Pursuant to § 291(b), the court was authorized to "make such orders as it deems expedient concerning . . . the care, custody, education, and maintenance of the minor children of the parties," including "determin[ing] with which of the parents the children, or any of them, shall remain." The court's decision turned on an evaluation of the children's best interests, and it was not limited to considering only those factors listed in 15 V.S.A. § 665; the court has discretion to consider other factors and also to rely "upon its own common sense and experience in reaching a reasoned judgment as to the best interests of the child." Osmanagic v. Osmanagic, 2005 VT 37, ¶¶ 5-6, 178 Vt. 538, 872 A.2d 897 (mem.).

¶ 21. The court's broad authority to make orders it deems "expedient" concerning the care and custody of the children includes the authority to make the requested findings where it concludes that doing so would further a child's best interests. See Chase v. Bowen, 2008 VT 12, ¶ 34, 183 Vt. 187, 945 A.2d 901 (recognizing trial court's "broad discretion" in custody cases in determining what course of action is in children's best interests); see also In re B.L.V.B., 160 Vt. at 371, 628 A.2d at 1273 (recognizing that where statute's goal "is to promote the welfare of children," it must be applied to "implement that purpose").

¶ 22. In the context of this and similar cases, the question of a possible return to one's country of origin and the implications of such a move on a child's best interests, as well as the viability of reunification with a parent in that country, are not abstract questions. They will be "the reality of these children's lives" absent a successful application for SIJ status. In re B.L.V.B., 160 Vt. at 376, 628 A.2d at 1276; see also J.U., 176 A.3d at 139 n.6 ("While the ultimate decision for SIJ status is with the federal government, it might be observed that the refusal by a juvenile court to make a requisite finding can have the effect of leaving the minor open to deportation, thus making it a significant decision in itself."); In re Luis G., 764 N.W.2d 648, 654 (Neb. Ct. App. 2009) (concluding that "without the order of eligibility, including the required findings from the

state court, [applicants] would be barred from proceeding in the federal system with a valid application for special immigrant juvenile status and would face deportation"). For these reasons, a court's refusal to make the SIJ findings, when making the findings would serve the child's best interests, would generally exceed the court's discretion.

¶ 23. When a court does find it in a child's best interests to make these findings, it must construe the terms "abuse," "neglect," and "abandonment" broadly. See Romero, 205 A.3d at 914-15 (holding that broad interpretation of these terms required to protect children and serve Congressional intent, adopting position of J.U., 176 A.3d at 143, and citing B.R.L.F. v. Sarceno Zuniga, 200 A.3d 770, 777 (D.C. 2019) (stating that "all the relevant factors must be understood in the light most favorable to determinations of neglect and abandonment")). The court here did not need to find, for example, that father permanently abandoned the children to establish that reunification with father was not viable. See J.U., 176 A.3d at 140 (stating that court must focus on precise question before it, which "is not the abstract question whether the minor has been . . . abandoned by the father," but rather "whether reunification with the father in [country of origin] is 'viable' due to 'abandonment' ").

¶ 24. In the SIJ context, "the concept of abandonment is being considered not to deprive a parent of custody or to terminate parental rights but rather to assess the impact of the history of the parent's past conduct on the viability, i.e., the workability or practicability of a forced reunification of parent with minor, if the minor were to be returned to the home country." Id. at 141; see also Romero, 205 A.3d at 912-13 (citing J.U., 176 A.3d at 141; U.S. Citizenship & Immigration Servs., Policy Manual, vol. 6, part J, ch. 2, § D.2 (stating that to satisfy reunification-viability requirement, "actual termination of parental rights is not required")) (recognizing that SIJ status cases "do not involve any termination of parental rights; they merely entail judicial fact finding about the viability of a forced reunification between a parent and a child"). This "calls for a realistic look at the facts on the ground in the country of origin and a consideration of the entire

11

history of the relationship between the minor and the parent in the foreign country." J.U., 176 A.3d at 140. To the extent that the trial court perceived that a finding that reunification with father is not viable would be tantamount to terminating father's parental rights, we clarify that the requested finding would not amount to a termination of father's parental rights, and would not preclude future contact between children and father should father reestablish contact. Instead, the finding would serve simply as a finding—an assessment of the likely state of affairs based on the evidence before the court at the time of the hearing.

¶ 25. We do not suggest that the court must make findings favorable to mother. We leave it to the trial court to evaluate the evidence. In re J.J.X.C., 734 S.E.2d at 124 (holding that juvenile courts are "authorized to conclude that the petitioners failed to present evidence to support the SIJ factors or that their evidence was not credible"); Romero, 205 A.3d at 915 (stating that "trial judges should not abdicate their responsibility as fact finders; judges should assess witness credibility and discredit evidence when warranted"). We acknowledge that there may be challenges "in developing a proper evidentiary record," J.U., 176 A.3d at 141 n. 9, but "trial courts should bear in mind that Congress established the requirements for SIJ status knowing that those seeking the status would have limited abilities to corroborate testimony with additional evidence." In re Dany G., 117 A.3d 650, 655-56 (Md. Ct. Spec. App. 2015). We note that the "purpose of the [SIJ] law is to permit abused, neglected, or abandoned children to remain in this country," and we agree that "[i]mposing insurmountable evidentiary burdens of production or persuasion is . . . inconsistent with the intent of the Congress." Id. Thus, in evaluating the sufficiency of the evidence, courts should remain mindful that " 'creation of contrary evidence [often] rests on surmise,' particularly in uncontested cases," and "all evidence in SIJ status cases is 'made under penalty of perjury and would appear to have some presumptive validity.' " Romero, 205 A.3d at 915 (quoting J.U., 176 A.3d at 141 n.9).

12

¶ 26. We further agree with courts holding that "[t]he immigrant child's motivation is irrelevant to the judge's special findings," and that a trial court need not determine whether the child will ultimately be eligible for SIJ status under the federal statute and regulations. Penate, 76 N.E.3d at 966; see also Simbaina, 109 A.3d at 202 (explaining that "state court's role in the SIJ process is not to determine worthy candidates for citizenship, but simply to identify abused, neglected, or abandoned alien children under its jurisdiction who cannot reunify with a parent or be safely returned in their best interests to their home country" (citation omitted)); Hernandez-Lemus v. Anas-Diaz, 100 N.E.3d 321, 323 (Mass. 2018) ("A judge may not decline to make special findings based on his or her assessment of the likelihood that the SIJ application ultimately will be successful before the Federal authorities, or on any consideration of the juvenile's motivation for seeking SIJ status."); H.S.P., 121 A.3d at 858 (explaining that it is for federal government, not state courts, to determine if "immigrant's purpose in applying for SIJ status matches with Congress's intent in creating that avenue of relief"). "[T]rial judges are not gatekeepers tasked with determining the legitimacy of SIJ petitions; that is exclusively the job of USCIS." Romero, 205 A.3d at 915; see J.U., 176 A.3d at 141 n.9 ("It is the responsibility of USCIS, not the juvenile court, to determine whether the SIJ status request is 'bona fide.'" (citing 8 U.S.C. § 1101(a)(27)(J)(iii))). "To conclude otherwise would upset the balance struck between the State and Federal roles in the SIJ status determination, and intrude in the area of immigration that lies exclusively within the purview of the Federal government." Penate, 76 N.E.3d at 966-67.

¶ 27. As set forth above, we conclude that the role of our state courts in the SIJ process is to continue making decisions that serve children's best interests. This includes making SIJ findings where requested if doing so promotes a child's best interests. This is consistent with the broad authority of our trial courts in these matters and it serves the goal of the Vermont Legislature and Congress to "protect abused, neglected, or abandoned children." Yeboah v. U.S. Dep't of Justice, 345 F.3d 216, 221 (3d Cir. 2003).

13

¶ 28. We therefore reverse the trial court's decision and remand to allow the court to determine if making the SIJ findings requested by mother would serve the children's best interests and, if so, whether the evidence supports them. Given that one of the children will turn eighteen on July 13, 2019, the Court waives the reargument period and orders that the mandate issue immediately. See V.R.A.P. 41(a).

The court's denial of mother's request for special findings is reversed and the case is remanded to the trial court for additional proceedings consistent with this opinion. The mandate shall issue immediately and the trial court shall issue its findings forthwith.

FOR THE COURT:

_____

Chief Justice